

# NUMBER 13-21-00058-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

## IN THE INTEREST OF J.K.R. AND H.L.R., CHILDREN

---

### On appeal from the 329th District Court
### of Wharton County, Texas.

---

# OPINION

### Before Justices Longoria, Hinojosa, and Silva
### Opinion by Justice Silva

Appellant Zane appeals the trial court's orders modifying the parent-child relationship and modifying a protective order.[1] By four issues, which we reorganize, Zane argues that the trial court erred by: (1) extending the original protective order beyond two years in contravention of Texas Family Code § 87.002, *see* TEX. FAM. CODE ANN. § 87.002; (2) "making the immaterial, yet prejudicial, finding of a felony offense involving

---

[1] We refer to the parties and children by aliases in accordance with the rules of appellate procedure. *See* TEX. R. APP. P. 9.8(b)(2), cmt.

family violence"; (3) finding that Zane's actions constituted a felony offense involving family violence without legally or factually sufficient evidence; and (4) awarding appellee Carla attorney's fees because there was insufficient evidence to support the award. We reverse and render in part and affirm in part.

## I.  BACKGROUND

### A.  Procedural Background

Zane and Carla were married on July 26, 2003. They had two children, Jace and Hunter, and divorced pursuant to an agreed divorce decree on March 9, 2017. However, on February 13, 2019, the trial court entered an agreed protective order that, among other things, prohibited Zane from communicating with Carla and going within 200 feet of her residence or place of work or the children's school. The trial court found that the "protective order [was] in the best interest of [Carla], the family or household and the members of the family or household." The order was set to expire on February 13, 2021.

Subsequently, Zane filed a petition to modify the parent-child relationship and a motion to review, modify, and reform the protective order, asserting that Carla was "using the [p]rotective [o]rder to [interfere] with the daily activities of [Zane] and his interaction[s] with his children." The motion did not specify which provisions or in what manner Zane sought to modify the protective order. On October 10, 2019, Carla filed a counterpetition to modify the parent-child relationship.

### B.  Factual Background

The trial court held a two-day combined bench trial for the suit affecting the parent-child relationship (SAPCR) and protective order modifications beginning on October 5,

2

2020. At trial, five witnesses, including the parties, testified and forty exhibits were admitted. We review the relevant testimony and exhibits admitted therein.[2]

### 1. Carla

Carla testified that she only agreed to the original divorce decree and possession schedule because Zane threatened to kill her if she did not agree. Carla admitted several audio recordings and text messages between her and Zane from before and after their divorce. In a recording preceding the divorce, Zane can be heard telling Carla, "I will crucify you. I will f—ing kill you, actually." Later in the same audio, Zane proclaims, "The second you lie to me . . . I will f—ing crucify you." Zane assured Carla that "life [is not] going to be any easier without [him] in the house than [him] within the house. It[ i]s going to be ten times worse." When discussing the possibility of Carla getting into a new romantic relationship, Zane said "if [he] do[es no]t kill [her new partner], [he] will shoot him. If [he] do[es no]t shoot him, [he] will beat the hell out of him." Zane proclaimed that he would control "every aspect" of Carla's life "until [he] do[es not] want to anymore" and that "nobody can stop [him]."

According to Carla, two days prior to signing the original divorce decree, Zane went to Carla's home, upset after learning that Carla might ask for child support. Zane entered the home and "before [Carla] knew it, [she] was up against the wall with a forearm.[[3]]"

---

[2] Two expert witnesses testified at trial: Cynthia Chilcote, a licensed clinical social worker, and Linda Butcher, a licensed family and marriage counselor. Chilcote testified to her experience counseling the children while Butcher testified to her experience providing counseling services to Zane. Their testimony is not relevant to the disposition of this appeal.

[3] The record does not reflect that Carla made any gestures to explain what "with a forearm" meant, but during cross-examination, the event was referred to as "the choking incident" by Zane's counsel.

Carla said the children were in a nearby room during the assault. Two days later, after the decree was signed, Zane went back to Carla's home, but she immediately left when he entered, found a police officer, and requested assistance in getting Zane to leave. Carla explained that Zane's calls and text messages "never stopped" and that "[t]here was physical abuse . . . every couple [of] months."

In a recording from March 2017, Zane is heard calling Carla a "f—ing liar," while acknowledging that the children are with him and could hear him speak to her. Zane again iterated that his behavior was "never gonna stop." An April 2017 recording includes Zane conceding that he would drink and drive with the children in the car if Carla did not "do what [she is] supposed to do.[4]" In the same recording, Zane asked to see Carla's pictures, videos, and text messages of his abusive behavior towards her. Carla declined and accused Zane of "delet[ing]" prior recordings, which Zane initially denied, maintaining that it was not necessary to do so because they had not been incriminating. Zane later admitted to deleting the recordings "just to prove [his] point" that he could.

Carla described different situations wherein Zane, unbeknownst to her, had obtained information about her plans or whereabouts and attempted to interfere. In one instance, Zane learned that Carla had plans to go to New Orleans, including which hotel she had reservations with. Zane blocked Carla's car in with his truck, at her home, so she did not go to New Orleans. In another situation, Zane was threatening to not take the children to their baseball practice unless Carla cancelled her dinner plans and took the

---

[4] The recording began immediately before Zane's statement and it is not apparent from the recording what Carla was "supposed to do."

children to a football game. When she refused, Zane took the children to the restaurant where Carla was having dinner with friends. While outside the restaurant, Zane had the children "FaceTime" Carla, which caused her to see they were outside the restaurant. Fearing Zane would hurt her or her friends, Carla left the restaurant. Carla produced text messages from the same event where Zane threatened to "expose" her to the children. Carla later learned that Zane had been accessing her voicemails and other communications to learn about her plans.

Carla described a series of events in December 2017, the genesis of which stemmed from Carla going out of town to watch a college football game. Carla testified that Zane called her "one hundred, two hundred times" and sent her "two hundred, three hundred text messages telling [her] what was going to happen to [her] whenever [she] got home." After she returned home, Zane tried "to find all kinds of ways to get [her] over [to his house]." One of the ways he did so was by telling Carla that he needed one of the boys' lunchbox before school. In order to avoid conflict, Carla tried to drop the lunchbox off outside of Zane's house at 5:30 a.m., but as she was dropping it off, Zane opened the front door and approached her vehicle. With the boys watching, Zane opened Carla's passenger door, got in her vehicle, grabbed her wrist then took her cell phone, garage door opener, and mail. Because Carla did not have her phone, she did not call the police, but she drove around town for a while until 7:30 a.m. when she saw an officer's wife outside of their home. Carla asked the officer's wife if he was home and she said that he was. The officer was off duty, so he called for backup. Carla explained that Zane was not arrested following the event.

5

The trial court admitted two recordings of phone calls between Carla and Zane from December 2017. In the first call, after Carla tells the boys to have a great day and that she loves them, Zane can be heard telling the boys: "Hey boys, look, mommy[ i]s running away. Look, remember what I told y[ou ]all: she[ i]s influenced by bad people." Zane then tells the boys, "I do[ no]t think mommy[ i]s going to the wrestling tournament this weekend and if she does, we[ a]re not going. . . . So y[ou ]all should probably tell her you do[ no]t want her to go [inaudible]." The second recording, which occurred shortly after the first but without the boys in the car, included Carla and Zane arguing about whether they should tell the children that they were divorced. When Carla said that she was ready to tell them, Zane responded: "Hey, you stupid c—t! It[ i]s Christmas, I[ a]m not going to tell them!" Zane said, "I know you[ a]re recording me; it[ i]s okay." During the call, Carla referenced her attempt to drop off the lunchbox, but Zane denied grabbing her wrist.

After the lunchbox incident, Carla filed a motion to modify the parent-child relationship and sought and received a temporary restraining order; however, she explained that the order was not converted to a final order because a surveillance video of the incident did not have audio, so she nonsuited the request. Carla testified, "[M]y life was a living hell after that. . . . [Zane] told me if [I] ever go to the police or to a lawyer again, [my] life will be a living hell and [he] will kill [me]." Carla produced a text message from Zane that asked, "Have [you] emailed [your attorney] to get everything dropped like you said you would if signed off on vacations [sic]?" Carla also provided a text conversation with Zane where he told her, "Just to ruin your plans[,] I'm not taking the kids to fittball [sic] game[,] [yo]u can[.]" Zane additionally told her that if she does not

6

explain why she was lying to him about who she was spending time with, he would tell the boys their baseball practice was cancelled and not take them.

In a January 2019 recording, Zane said, "Hitmen are real. My friend used to be one," and threatened to "pay somebody to do it." In a separate January 2019 recording, Carla told Zane that she had proof that he had "hacked" into her phones. Zane replied that he had obtained access to several of her devices using "[his] iMac and [the] kids' iPads." Zane told Carla that if there were any more legal issues, it would "create a lot of issues for [her]." When Carla accused Zane of also hacking into her personal and work voicemails, Zane retorted, "There's [sic] all kinds of ways to find things out . . . . How do you know something[ i]s not tapped?" Zane ultimately admitted to checking Carla's voicemails but claimed it was not "hacking" because he had her password. Carla testified that Zane has now been indicted for felony stalking and wiretapping. *See* TEX. PENAL CODE ANN. § 42.072 (stalking); *id.* § 16.02 ("Unlawful Interception, Use, or Disclosure of Wire, Oral, or Electronic Communications," commonly referred to as "wiretapping"). It was after this that Carla obtained a protective order that prohibited Zane from communicating with her.

Carla testified that she was requesting the trial court to order Zane have a standard possession order because she feared Zane would go back to his previous behavior if he received anything more.

### 2. Ronald Collins

Carla's attorney, Ronald Collins, offered evidence related to the attorney's fees that accrued during the case. Collins offered an invoice of attorney's fees as an exhibit,

which the trial court admitted. The following exchange occurred:

| | |
|---|---|
| [Collins]: | And finally, Your Honor, I will testify as to attorney[']s fees. It is my understanding Mr. Maher is agreeable to stipulating to both my qualifications and to the hourly rates that I'm charging in this case for both myself, any associate attorneys in our law firm, as well as the paralegal costs. |

. . . .

| | |
|---|---|
| [Zane's Counsel]: | Let me stipulate to to [sic] speed it up. I stipulate to his qualifications, subject to my objection. I stipulate to his rates, and I actually stipulate that it's a business record he's created, Exhibit Number 39.[5] |
| The Court: | All right. 39 then is—your objection is overrule[d] and 39 is admitted. |
| [Collins]: | Here is Exhibit No. 39. I'm handing it to the Court. Would the Court want to hear any testimony from me in that regard, since it's been stipulated to and the amounts are set[ ]out in there? |
| The Court: | No, I do not. |
| [Collins]: | Then based upon that, Your Honor, the Respondent Counter-Petitioner will rest. |

The invoice includes descriptions of activities, dates, amount of time, and amount billed. Next to each line item includes initials under the heading "Lawyer." Collins provided no other testimony or evidence regarding attorney's fees.

### 3. Zane

Zane also testified at trial, acknowledging that it was his voice in Carla's

---

[5] Zane objected to the invoice as an exhibit on the grounds that Carla did not include attorney's fees "as an element of damages" in disclosures. See Tex. R. Civ. P. 194.2(d). Zane does not challenge the trial court's ruling on appeal.

recordings. When asked about his behavior on the recordings, Zane explained, "That's not who I am. . . . I reacted inappropriately." Zane testified that he has accepted responsibility for his behavior, which he believes was demonstrated by voluntarily seeking professional help and implementing the lessons he learned in his everyday life. Zane believed that he and Carla staying away from each other was "[t]he best thing that's happened." However, Zane also equivocated at times when referring to his past behavior towards Carla, describing her testimony as a "story that's being created," or claiming "that things have been told and twisted" between he and Carla. Zane denied physically assaulting Carla. Zane stated that he would continue seeing his therapist and psychiatrist. The majority of Zane's testimony revolved around Jace and Hunter's best interests as it related to his requested modification of possession and access.

## C.    Trial Court Ruling

On November 19, 2020, the trial court signed separate orders for each modification.[6] As to the protective order, the trial court modified its February 13, 2019 order to include a finding that Zane had committed an act constituting a felony offense involving family violence against Carla and extended the protective order "until the end of the second[-]year anniversary of the date all currently pending felony indictments against [Zane] have been resolved." The trial court removed Jace and Hunter as persons protected under the protective order.

The trial court modified the SAPCR order by: (1) removing a geographic restriction

---

[6] The orders include recitations that the trial court heard the motions on October 5, 2020; however, the reporter's record reflects that trial occurred on October 5 and 6, 2020.

9

to Wharton County for the children, granting Carla the exclusive right to designate their residence; (2) implementing a standard possession order;[7] (3) eliminating the right of first refusal; (4) increasing child support from $1,500.00 to $2,070.00 per month; (5) requiring Zane to participate in counseling and psychiatric services; (6) granting Carla the exclusive right to make decisions regarding the children's enrolled extracurricular activities; (7) requiring Zane and Carla to communicate through a co-parenting application; and (8) enjoining Zane and Carla from engaging in various bad behavior, such as making disparaging remarks to or about each other, and discussing various aspects of the suit with the children. The trial court also granted Carla $43,385.96 in reasonable attorney's fees and court costs.

This appeal followed.

## II.    PROTECTIVE ORDER

### A.    Extension of the Original Protective Order

We first address Zane's arguments that the trial court erred by: (1) extending the duration of the protective order; and (2) finding that Zane committed a felony-level act of family violence.

### 1.    Standard of Review and Applicable Law

Matters of statutory interpretation are reviewed de novo. *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018). "In construing a statute, our objective is to determine and

---

[7] The original possession order set out a "2-2-5" rotating visitation schedule with extended summer possession for Zane. A "2-2-5" schedule includes each parent having two fixed days of possession each week and the remaining three days rotate between parents. For example, Carla had possession of the boys on Monday and Tuesday while Zane had them Wednesday and Thursday. Each parent would alternate possession on Friday, Saturday, and Sunday. Thus, each parent has two days of visits in the beginning, and then alternates between two and five days per week.

give effect to the Legislature's intent." *Id.* (quoting *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003)). "[L]egislative intent derives from an act as a whole rather than from isolated portions of it." *Id.* "We construe a statute's words according to their plain and common meaning, unless a contrary intention is apparent from the context, or unless such a construction leads to absurd results." *Id.* (cleaned up); *see also* TEX. GOV'T CODE ANN. § 312.005.

A trial court retains jurisdiction to modify a protective order on the motion of any party until the order expires. TEX. FAM. CODE ANN. § 87.001. However, "[a] protective order may not be modified to extend the period of the order's validity beyond the second anniversary of the date the original order was rendered or beyond the date the order expires under [§] 85.025(a-1) or (c), whichever date occurs later.[8]" *Id.* § 87.002 *but see id.* § 82.008 ("Application Filed After Expiration of Former Protective Order"); *id.* § 82.0085 ("Application Filed Before Expiration of Previously Rendered Protective Order"). Under § 85.025(a-1), a protective order, when originally issued, may exceed two years under three scenarios. *Id.* § 85.025(a-1). As applicable here, a protective order may exceed two years

> if the court finds that the person who is the subject of the protective order committed an act constituting a felony offense involving family violence against the applicant or a member of the applicant's family or household, regardless of whether the person has been charged with or convicted of the offense.

*Id.* § 85.025(a-1)(1).

---

[8] Section 85.025(c) is not applicable to this case.

11

## 2. Analysis

Zane argues that § 87.002 provides an express limitation on the trial court's ability to extend the duration of a protective order. *See* TEX. FAM. CODE ANN. § 87.002. Carla, on the other hand, argues that § 87.001's authority to add "any item" that could have been originally added, coupled with § 87.002's reference to § 87.025(a-1), allows the trial court to modify the protective order to include a finding of family violence and extend the protective order to any date that it could have expired under § 87.025(a-1). For the reasons explained below, we agree with Zane.

The question posed in this case presents a matter of first impression. Neither party cited to any authority that discussed the application or limitation of § 87.002, and we found none. This is purely a matter of statutory interpretation. In construing § 87.002, we must determine and give effect to legislature's intent, apply the plain meaning of the words, and maintain harmony with the act as a whole. *See Youngkin*, 546 S.W.3d at 680.

Here, the act in question is Title 4 of the Texas Family Code, which governs protective orders pertaining to family violence. *See* TEX. FAM. CODE ANN. § 71.001– § 93.004. Under Title 4, a trial court may grant a protective order if it finds that family violence has occurred and is likely to occur again in the future. *See id.* §§ 81.001, 85.001. A trial court has wide discretion to order a party subject to a protective order to engage in or refrain from a variety of acts to protect an individual who has been subjected to family violence. *See id.* §§ 85.021, 85.022. A person who is subject to a protective order but violates it may be subject to criminal prosecution. *See* TEX. PENAL CODE ANN. § 25.07. However, the legislature also placed some limitations on protective orders. For example,

12

subject to certain exceptions, a protective order generally may not exceed two years. *See* TEX. FAM. CODE ANN. § 85.025(a).

Section 87.001 provides broad discretion to a trial court to remove or add any item that may have been included in the original protective order. *See id.* § 87.001; *In re S.S.*, 217 S.W.3d 685, 687 (Tex. App.—Eastland 2007, no pet.). An original protective order entered under § 85.025(a-1) may exceed two years and does not have an express limitation on its duration. *See* TEX. FAM. CODE ANN. § 85.025(a-1). However, the plain language of § 87.002 provides an express limitation to the trial court's authority to extend the duration of a protective order. *See id.* § 87.002. The limitation on the extension of a protective order depends on the date that the trial court originally set as the protective order's expiration date. *See id.* For example, if the trial court ordered a protective order to expire three years after its entry, the trial court could not extend its duration beyond three years. *See id.* Similarly, if the trial court ordered a protective order to expire two years after its entry, the trial court could not extend its duration beyond two years. *See id.* The exception is if, for example, the trial court ordered the protective order to expire one year after its entry, the trial court could modify the protective order to expire as late as two years after it was entered. *See id.*

In other words, the order cannot be modified beyond two years from the date it was entered or beyond the original date of expiration under § 85.025(a-1) if it is two years or beyond. *See id.* Here, the original expiration date was two years from the date of entry. Thus, the trial court could not modify the protective order to extend beyond that date. *See id.* This conclusion is consistent with the plain language of the statute and the Act as

13

whole. *See Youngkin*, 546 S.W.3d at 680. While § 87.001 provides a trial court with broad authority to modify a protective order, § 87.002 places a clear and express limitation on that authority. *See* TEX. FAM. CODE ANN. §§ 87.001, 87.002. The limitations of § 87.002 are consistent with the limitations found in § 85.025. *Compare id.* § 85.025, *with id.* § 87.002. We conclude the trial court erred by extended the duration of the protective beyond two years from the date it was originally entered. Zane's first issue is sustained.

## B.    Finding of Felony Family Violence

### 1.    Standard of Review and Applicable Law

In a bench trial, a trial court's factual findings "have the same force and dignity as a jury's verdict upon questions." *Valley Diagnostic Clinic, P.A. v. Dougherty*, 287 S.W.3d 151, 155 (Tex. App.—Corpus Christi–Edinburg 2009, no pet.). We apply a factual and legal sufficiency of the evidence review to protective orders. *Clements v. Haskovec*, 251 S.W.3d 79, 84 (Tex. App.—Corpus Christi–Edinburg 2008, no pet.).

"An ultimate fact issue . . . is one that is essential to the cause of action and has a direct effect on the judgment." *Cooke Cnty. Tax Appraisal Dist. v. Teel*, 129 S.W.3d 724, 731 (Tex. App.—Fort Worth 2004, no pet.). A finding is immaterial if, among other things, it cannot alter the effect of a judgment. *Brazos Contractors Dev., Inc. v. Jefferson*, 596 S.W.3d 291, 306 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). Generally, if a finding is immaterial it should be disregarded. *See Andrews v. Key*, 13 S.W. 640, 641 (Tex. 1890) ("If [findings of fact are] immaterial, they are harmless."); *see also Sister Initiative, LLC v. Broughton Maint. Ass'n, Inc.*, No. 02-19-00102-CV, 2020 WL 726785, at *26 (Tex. App.—Fort Worth Feb. 13, 2020, pet. denied) (mem. op.) ("[A]n immaterial

14

finding of fact is harmless and not grounds for reversal." (quoting *RH White Oak, L.L.C.*

*v. Lone Star Bank*, No. 14-16-00840-CV, 2018 WL 4925118, at *7 (Tex. App.—Houston

[14th Dist.] Oct. 11, 2018), *review granted, judgment vacated, and remanded by*

*agreement* (Feb. 8, 2019) (mem. op.)); *Lockhart v. McCurley*, No. 10-11-00073-CV, 2013

WL 1286659, at *7 (Tex. App.—Waco Mar. 28, 2013, no pet.) (mem. op.) ("Findings that

are evidentiary issues or recitations, rather than controlling issues, are immaterial and

thus harmless . . . .").

There is no requirement that a party show a change of circumstances before a trial

court may modify a protective order. *In re S.S.*, 217 S.W.3d at 686. When modifying a

protective order, a trial court may remove any item or add any item that could have been

included in the original order. TEX. FAM. CODE ANN. § 87.001. The term "any item" as used

in § 87.001 is unambiguous. *In re S.S.*, 217 S.W.3d at 687 (concluding the trial court did

not err by amending a protective order to include appellate attorney's fees).

### 2. Analysis

By his second and third issues, Zane presents a two-fold challenge to the trial

court's addition of a finding of felony family violence to the protective order: (1) the trial

court used this finding to base its extension on and without the extension, the finding is

immaterial and should be disregarded; and (2) the evidence supporting the finding was

factually and legally insufficient. Because we conclude the finding is immaterial, we only

address Zane's second issue. *See* TEX. R. APP. P. 47.4.

As previously discussed, § 87.001 provides a trial court with broad authority to

amend a protective order. *See* TEX. FAM. CODE ANN. § 87.001. According to Zane,

15

because the trial court could not extend the protective order beyond its original expiration date, a finding that Zane's acts of family violence constituted a felony is immaterial. In other words, Zane argues that the finding has no effect. As Zane notes, if a finding is immaterial it should generally be disregarded. *See Andrews*, 13 S.W. at 641; *see also Sister Initiative*, 2020 WL 726785, at *26; *Lockhart*, 2013 WL 1286659, at *7. Because the trial court's finding is not essential to the cause of action and has no effect on the judgment, it is immaterial and harmless. *See Brazos Contractors Dev.*, 596 S.W.3d at 306; *In re Marriage of Edwards*, 79 S.W.3d 88, 94–95 (Tex. App.—Texarkana 2002, no pet.); *see also Sister Initiative*, 2020 WL 726785, at *26; *Lockhart*, 2013 WL 1286659, at *7.

Zane implores this Court to apply the collateral consequences exception to mootness and reform the judgment "so as to remove and strike the immaterial and unnecessary finding of a felony offense involving family violence." The collateral consequences exception allows an appellate court to review otherwise moot issues due to the inherent prejudicial consequences that stem from a judgment, such as a protective order. *See Clements*, 251 S.W.3d at 84; *see also Heckman v. Williamson County*, 369 S.W.3d 137, 162 (Tex. 2012) ("[A] court cannot decide a case that has become moot during the pendency of the litigation."). However, we decline to extend the collateral consequences exception to mootness as a ground for removing immaterial findings. Even so, the collateral consequences of a protective order derive from the finding of family violence and entry of the order itself—irrespective of the offense level of violence found. And Zane has not shown that any additional collateral consequences stem from the

16

finding that his actions constitute a *felony offense* involving family violence. *See Clements*, 251 S.W.3d at 84.

Accordingly, we overrule Zane's third and fourth issues as any error by the trial court's finding is harmless. *See Andrews*, 13 S.W. at 641; *see also Lockhart*, 2013 WL 1286659, at *7 ("Because we disregard the unnecessary evidentiary recitations, we overrule [appellant's issue].").

### III. ATTORNEY'S FEES

### A. Standard of Review and Applicable Law

A trial court has broad discretion to award reasonable attorney's fees for suits under Title 5 of the Texas Family Code. TEX. FAM. CODE ANN. § 106.002(a); *In re K.M.B.*, 606 S.W.3d 889, 900 (Tex. App.—Dallas 2020, no pet.). Title 5 includes SAPCRs and modifications of SAPCR orders. *See* TEX. FAM. CODE ANN. §§ 153.001–153.709; 156.001–156.409. A trial court's award of attorney's fees in a SAPCR is reviewed for an abuse of discretion. *In re K.M.B.*, 606 S.W.3d at 900.

"When fee-shifting is authorized, whether by statute or contract, the party seeking a fee award must prove the reasonableness and necessity of the requested attorney's fees." *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 484 (Tex. 2019); *Sims v. Sims*, 623 S.W.3d 47, 66 (Tex. App.—El Paso 2021, pet. denied). "General, conclusory testimony devoid of any real substance will not support a fee award." *Rohrmoos*, 578 S.W.3d at 501. Instead, the claimant should present evidence of "(1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform

17

the services, and (5) the reasonable hourly rate for each person performing such services." *Id.* at 502. To determine whether a fee is reasonable and necessary, the trial court should consider a non-exclusive list of factors including:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Id.* at 493–94 (quoting *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997)). "The [trial] court can also look at the entire record, the evidence presented on reasonableness, the amount in controversy, the common knowledge of the participants as lawyers and judges, and the relative success of the parties." *Nalle Plastics Fam. Ltd. P'ship v. Porter, Rogers, Dahlman & Gordon, P.C.*, 406 S.W.3d 186, 210 (Tex. App.—Corpus Christi–Edinburg 2013, pet. denied).

## B. Analysis

Zane argues the trial court abused its discretion by awarding Carla attorney's fees because: (1) "[t]here is no mention by [Carla] or her counsel of whether the fees incurred were necessary," and (2) "[t]here [was] no evidence presented that the attorney fees incurred were reasonable." Zane complains that the billing record admitted does not state Collins's hourly rate, "nor does it state that th[e] rate is reasonable in the locality, or that the services performed and identified in the billing records were necessary." Zane also argues that the record contains the initials of two other attorneys who were not identified,

18

nor were their hourly rates or qualifications. For the reasons explained below, we overrule Zane's issue regarding the award of attorney's fees.

The billing record that Collins produced contained approximately 112 time entries, totaling 175.10 hours, over a period of one year and eight months. The entries contain the date that the work was completed, a description of the work completed, the time spent on the work, the amount billed, and the initials of the individual who completed the work. As Zane acknowledges, although the hourly rate is not expressly stated, it can be easily discerned from the bill. Thus, the information contained within the invoice satisfies the first three requirements in *Rohrmoos*. *See Rohrmoos*, 578 S.W.3d at 498.

After Collins offered the invoice as an exhibit, Zane stipulated to the "rates" and "experience." Rather than object or raise issue on the lack of information in the invoice, Zane stipulated to material facts. "[A] stipulation 'obviates the need for proof on [the] litigable issue.'" *Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 822 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (quoting *Hansen v. Academy Corp.*, 961 S.W.2d 329, 335 (Tex. App.—Houston [1st Dist.] 1997, writ denied)). Thus, all that remained was for the trial court to determine the reasonableness and necessity of the time expended. *See Rohrmoos*, 578 S.W.3d at 498.

We review the relevant *Arthur Anderson* factors while bearing in mind that the trial court can draw on its knowledge of the proceedings while analyzing reasonableness and necessity. *See id.* at 493–94; *Nalle Plastics*, 406 S.W.3d at 210. As demonstrated by the record and Collins's invoice, this case involved a high-conflict relationship between the parties and included multiple hearings and temporary orders, an amicus attorney,

19

mediation, deposition of an expert witness, testimony of two expert witnesses, discovery requests and responses, and preparation and presentation of forty exhibits, many of which were audio or video recordings. *See Rohrmoos*, 578 S.W.3d at 493–94. Further, Carla received all the relief she requested, making her relative success high. *See Nalle Plastics*, 406 S.W.3d at 210. These factors support the trial court's implicit finding that the time spent was reasonable and necessary. *See Rohrmoos*, 578 S.W.3d at 493–94. Zane does not point to any item in the invoice which he argues was unreasonable or unnecessary and, after reviewing the exhibit, we find none. As such, we cannot say the trial court abused its discretion by awarding Carla attorney's fees. *See In re K.M.B.*, 606 S.W.3d at 900. Zane's third issue is overruled.

## IV.    CONCLUSION

We reverse the trial court's extension of the duration of the original protective order and render judgment striking the language from the amended order. We affirm the trial court's order in suit to modify the parent-child relationship.

CLARISSA SILVA
Justice

Delivered and filed on the
10th day of November, 2022.